UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| Richard C.,[1]<br><br>      Plaintiff,<br><br>      v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,<br><br>      Defendant. | No. 2:21-cv-0323-MJD-JPH |

**ENTRY ON JUDICIAL REVIEW**

Claimant Richard C. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). See 42 U.S.C. § 423(d). For the reasons set forth below, the Court **REVERSES** the decision of the Commissioner.

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

## I. Background

Claimant applied for DIB in April 2019, alleging an onset of disability as of March 27, 2019. [Dkt. 6-5 at 2.] Claimant's application was denied initially and upon reconsideration, and a hearing was held before Administrative Law Judge Nycole Watson ("ALJ") on December 18, 2020. [Dkt. 6-2 at 37.] On January 28, 2021, ALJ Watson issued her determination that Claimant was not disabled. *Id.* at 16. The Appeals Council then denied Claimant's request for review on June 22, 2021. *Id.* at 2. Claimant timely filed his Complaint on August 25, 2021, seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, he is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits his ability to perform basic work activities, he is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform his past relevant work, he is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform his past relevant work, but can

perform certain other available work, he is not disabled. 20 C.F.R. § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing Claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and her conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether Claimant is disabled. *Id.*

### III. ALJ Decision

The ALJ first determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of March 27, 2019. [Dkt. 6-2 at 18.] At step two, the ALJ found that Claimant had the following severe impairments: "major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder (PTSD)." *Id.* At step three, the ALJ found that Claimant's impairments did not meet or equal a listed impairment during the relevant time

period. *Id.* at 19. The ALJ then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can understand, remember, and carry out simple and detailed but uninvolved instructions in two hour increments sufficiently enough to complete an eight hour work day in an environment that does not require fast paced or production pace work. In addition, he can tolerate occasional interaction with coworkers and supervisors but no more than incidental or superficial interaction with the public. Finally, he must work in an environment where the work is stable and routine with no frequent workplace changes.

*Id.* at 21-22.

At step four, the ALJ found that Claimant was able to perform his past relevant work as a store laborer, car wash attendant, and construction worker II during the relevant time period. *Id*. at 28. The ALJ, relying on testimony from a vocational expert ("VE"), also made the alternative finding at step five that Claimant was able to perform jobs that exist in significant numbers in the national economy such as industrial cleaner, laundry laborer, and hand packager. *Id*. at 29. Accordingly, the ALJ concluded Claimant was not disabled. *Id.* at 30.

## IV. Discussion

Claimant sets forth several reasons why the ALJ's decision should be reversed. Each is addressed, in turn, below.

### A. Treating Source Opinion

Claimant first argues that the ALJ erred in her evaluation of the medical source statement of Claimant's treating psychiatric nurse practitioner, Valerie Markley. Claimant aptly summarizes Nurse Markley's statement as follows:

> She said that he came to her for medication management at least every two months, saw his therapist usually once a week, and saw a case manager "when

4

> available."  She listed diagnoses of PTSD, major depressive disorder, generalized anxiety disorder, ADHD, and alcohol use disorder in remission.  She assessed a GAF score of 55, although noting that DSM-V no longer used the multiaxial system of diagnosis.  She listed current medications of Effexor, bupropion, Klonopin, Ritalin, and trazodone.  She noted that his mood had been consistently low, which was reflected in his affect.  "Although he readily engages," she wrote, "he has an anxious and constricted presentation.  He has a low self-esteem with a lot of guilt and self-doubt.  His main issues involve getting along with people over time in the workplace due to his sensitivity and low self-esteem."  While she hoped that he could improve with continued treatment, she noted that he was 42 years old and had "demonstrated a continued decline in his ability to function satisfactorily in the workplace."  She opined that Plaintiff was unable to meet competitive standards regarding working in coordination with or in proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, and getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes.  She also indicated that he was seriously limited, but not precluded, from dealing with normal work stress and had limited but satisfactory abilities in several other areas.  She estimated that he would be absent from work as a result of his impairments or treatment more than four days per month.  She noted that alcohol had "not been a consistent factor in Richard's life, but it has compounded his difficulties when he has used it"; furthermore, while he had been alcohol-free for more than 6 months at the time of the opinion, "his life situation has not improved; his [dysfunctional] anxiety prevails."  She provided an additional narrative in which she wrote in part, "It seems that every time he tries to advance, his anxiety and difficulty relating to people pull him back down again.  He has a pattern of repeated difficulties sustaining effective relationships."

[Dkt. 11 at 12-13] (quoting [Dkt. 6-7 at 211-16]) (internal citations omitted).

Because Claimant advanced this claim after March 27, 2017, the applicable law no longer requires an ALJ to give special weight to the opinion of Claimant's treating physician.  *See* 20 C.F.R. § 404.1520c(a).  Rather, an ALJ must evaluate all medical opinions—from treating providers, consultative examiners, and independent medical examiners—on an equal basis for "persuasiveness."  *Id.*  ALJs are instructed to evaluate all medical opinions using factors including whether the opinion is supported by objective medical evidence; the opinion's consistency with other evidence; the professional's relationship with the patient, including the

5

length, frequency, purpose, and extent of treatment; and the professional's specialization. 20 C.F.R. § 404.1520c(c). In addition, the regulation expressly recognizes that "[a] medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder." 20 C.F.R. § 404.1520c(c)(3)(v). After considering the relevant factors, an ALJ must articulate how persuasive she finds each medical opinion in her decision. 20 C.F.R. § 404.1520c(b). The most important factors ALJs will use in determining the persuasiveness of a medical opinion are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). Opinions that are supported by and consistent with objective medical evidence will be most persuasive. 20 C.F.R. § 404.1520c(c)(1)-(2).

> Here, the ALJ assessed the persuasiveness of Nurse Markley's opinion as follows:
>
> Finally, I find the assessment from Valerie Markley, the claimant's treating nurse practitioner, at Exhibit 8F, to be somewhat persuasive as it was completed in the context of her active treatment relationship with the claimant. However, a number of the limitations assessed appear to be based largely on the claimant's subjective self-reports rather than the generally normal or mild and stable findings noted by Ms. Markley on mental status examinations during the claimant's treatment sessions. In addition, the records show that the claimant's condition was largely stable with regular reports of significant improvement in his symptoms through treatment without significant complaints of negative side effects or complications. Finally, the extreme limitations assessed are also inconsistent with the claimant's own reports during the hearing and throughout the record regarding his ongoing activities of daily living, including participating in regular treatment, caring for his family, performing household chores and cooking, volunteering at the substance abuse program and engaging in various activities with his children. (Exhibits 3F, 4F, 6F, 7F, and 9F).

[Dkt. 6-2 at 27-28.]

First, the Court notes that the ALJ repeatedly states, in various ways, that Claimant's mental healthcare records show improvement in his condition, and, as quoted above, the ALJ found Nurse Markley's opinions to be inconsistent with Claimant's "regular reports of significant

6

improvement in his symptoms." *See* [Dkt. 6-2 at 20 ("These records also reveal that he reported improvements with his symptoms with medication."); *id.* ("The treatment records also reveal that he regularly reported improvement in his condition with medication."); *id.* at 21 ("[H]e also reported engaged [sic] in regular substance abuse and mental health treatment with no issues of noncompliance noted and repeated reports of significant improvement in his symptoms."); *id.* at 23 ("He reported attending regular mental health treatment including therapy and medication management and feeling that his symptoms are improving overall with some negative side effects."); *id.* ("He reported some improvement with his medication but also complained of trouble focusing."); *id.* at 24 ("During his [February 2020] medication management visit, he reported that his mood was better and that he was living at home with his wife and son."); *id.* at 26 ("The records also show that he regularly reported some improvement with his medication."); *id.* ("The additional treatment records show generally stable symptom complaints and clinical examination findings throughout his treatment sessions in 2020 and he was regularly continued on a regimen of medication, therapy, and casework with repeated reports of improvement with treatment."); *id.* ("The notes [from his primary care provider in 2019 and 2020] show that he has reported some ongoing mental health issues during these sessions but also that he generally reported improvement and stability in his condition through medication and regular mental health treatment."); *id..* ("The mental health treatment records show that he has received regular medication, therapy, and casework assistance throughout 2019 and 2020 with repeated reports of improvement in his symptoms and functioning."); *id.* at 26-27 ("Overall, the records show that the claimant has achieved a significant level of improvement and stability through his regular participation in routine mental health treatment including therapy, case management, substance

abuse treatment, and multiple medications with no reports of any negative side effects or complications."); *id.* at 27 (Nurse Markley's "records show that the claimant's condition was largely stable with regular reports of significant improvement in his symptoms through treatment without significant complaints of negative side effects or complications.").

As an initial matter, the Court notes that, as the Seventh Circuit has acknowledged, "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011). Further, "[s]imply because one is characterized as 'stable' or 'improving' does not necessarily mean that" one is capable of full-time work. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), *as amended* (Aug. 20, 2014).

In any case, the Court's own review of the record as a whole reveals that the ALJ's determination that Claimant regularly reported significant improvement in his mental health symptoms is not based on substantial evidence. With very few exceptions, the ALJ does not cite to any specific records to support her conclusion, but rather refers generally to all of Claimant's mental health and/or primary care records. The ALJ does cite to an April 29, 2019, note from Claimant's primary care physician that "[h]e feels like things are improving" with the medication he had been prescribed, [Dkt 6-7 at 62], and a February 2020 note from Nurse Markley that his mood was improved, but the record is also replete with reports of Claimant's continued struggles with his mental health symptoms. Indeed, as Claimant notes:

> [Nurse] Markley has tracked Plaintiff's level of depression over time using regular PHQ-9 screening. PHQ-9 screening is recognized as a reliable and valid measure of the severity of a patient's depression; scores of 5 to 9 represent mild depression, 10 to 14 represent moderate depression, 15 to 19 represent moderately severe depression, and greater than 20 represent severe depression. [Claimant's] PHQ-9 scores over time have gone from 17 to 15 to 24, back to 15, up to 19,

8

> down to 13, up to 16, and most recently to 21. These scores, always representing at least moderate depression and often representing moderately severe to severe depression, span the course of Plaintiff's treatment with [Nurse] Markley, both when he was abusing alcohol and as he maintained sobriety for many months in the later records. This is strong objective support for the characterization of Plaintiff's depression and in fact completely contradicts the ALJ's claim that his condition has been stable or overall improving.

[Dkt. 11 at 15][2] (citing Sun, Yue et al, "The reliability and validity of PHQ-9 in patients with major depressive disorder in psychiatric hospital," *BMC psychiatry* 2020;20(1):474, available via U.S. National Library of Medicine, National Institutes of Health, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7525967/ (accessed 1/11/2022)) (additional internal citations moved to footnote). The Commissioner argues that

> [Claimant's] reliance on the PHQ-9 scores to show supportability is misplaced because NP Markley did not cite to these in her opinion (Pl. Br. 15). These scores reflect the severity of Plaintiff's depressive symptoms, but do not translate into functional limitations. Thus, because NP Markley did not rely on or interpret these scores, Plaintiff's argument that they supported the opinion is speculative and insufficient to undermine the ALJ's findings.

[Dkt. 14 at 12.] This argument misses Claimant's point; whether Nurse Markley cited to the PHQ-9 scores or not, they constitute evidence of record that contradicts the ALJ's reading of Claimant's medical records as showing "regular significant improvement." The ALJ's failure to acknowledge this evidence runs afoul of the ALJ's obligation to "confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore v. Colvin*, 743

---

[2] The PHQ-9 scores cited by Claimant are found at Dkt. 6-7 at 53 (April 10, 2019), 93 (May 8, 2019), 98 (May 31, 2019), 185 (July 24, 2019), 192 (September 4, 2019), 198 (December 18, 2019), 230 (February 26, 2020), 237 (April 22, 2020), and 244 (June 25, 2020).

F.3d 1118, 1123 (7th Cir. 2014) (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)).

The Court also does not find support in the record for the ALJ's conclusion that the "extreme limitations assessed [by Nurse Markley] are also inconsistent with the claimant's own reports during the hearing and throughout the record regarding his ongoing activities of daily living, including participating in regular treatment, caring for his family, performing household chores and cooking, volunteering at the substance abuse program and engaging in various activities with his children." [Dkt. 6-2 at 27-28.] Earlier in her decision, the ALJ described Claimant's daily activities as follow:

> In terms of his daily activities, the claimant testified that he attends to his personal care, lives alone, prepares simple meals, does laundry and household cleaning, cares for his pet kittens, shops for groceries, and regularly spends time with his son including watching television and movies, riding bikes, playing with remote control cars, and fishing. In his Function Report, he indicated that he lives with his family, spends time with and cares for his children, attends to his personal care with some effort, prepares meals, attends treatment and takes medications, and does regular cleaning, laundry, and lawn care. He also stated that he drives, shops online, and spends time watching television, fishing, and hanging out with his family. (Exhibit 3E). The treatment records also show that he attended regular treatment, including participating in an intensive outpatient substance abuse program, volunteering at the program and managing several different medications. The records also show that he regularly discussed spending time with his children and family. (Exhibits 4F, 7F, and 9F). Based on these admissions regarding his ongoing high level of regular activities and interactions, a more restrictive functional assessment has not been warranted at any time relevant to this decision.

*Id.* at 24. It is not readily apparent, and the ALJ does not explain, how these activities are inconsistent with Nurse Markley's opinion regarding Claimant's limitations. Nurse Markley opined that Claimant's "main issues involve getting along with people over time in the workplace due to his sensitivity and low self esteem," and that his "history of repeated problems with

10

anxiety and disruptive relationship problems are not compatible with successful work performance." [Dkt. 6-7 at 211, 215.] The fact that he was able to complete a residential substance abuse program and volunteer while he was there—which most certainly would have been an environment designed to be supportive and sensitive to his psychological needs—says nothing about his ability to work full-time in a normal work environment without decompensating. Indeed, none of the activities pointed to by the ALJ involved interacting with people other than family members and caregivers.

Finally, the Court notes that, when it comes to mental health impairments, an ALJ may not discount a medical opinion simply because it is based on the claimant's subjective reports; to do so ignores the nature of mental health treatment. *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (citing *Price v. Colvin*, 794 F.3d 836, 839-40 (7th Cir. 2015) ("all findings in psychiatric notes must be considered, even if they were based on the patient's own account of her mental symptoms")). As the Seventh Circuit has noted,

> the subjective report is not simply transcribed: it is filtered through the psychologist's training and judgment. Like a medical doctor evaluating physical pain, a psychologist must start with the patient's description of her own experience; this is not a defect. Subjective complaints are nevertheless assessed according to the profession's objective criteria; what the psychologist puts out is not a simple transcription of the patient's self-report.

*Thompson v. Berryhill*, 722 F. App'x 573, 581 (7th Cir. 2018) (internal citations omitted). Similarly, in *Adaire v. Colvin*, the court noted that the fact that treating mental health providers had not witnessed the claimant's panic attacks

> was no basis for disbelieving that he experiences panic attacks. He said he did, the psychologist and the therapist believed him, and the administrative law judge had no basis for disbelieving them. The logic of her remark is that *nothing* an applicant says should be believed; disability determinations should be based

> entirely on the results of medical tests. Such a rule would flout the Social
> Security Administration's regulation that we quoted earlier.

778 F.3d 685, 688 (7th Cir. 2015). In the absence of a properly supported reason why the ALJ believed Nurse Markley's professional assessment of the accuracy of Claimant's subjective reports—reports she relied upon in determining the course of his treatment—was incorrect, it was improper for the ALJ to reject that assessment because it was based on those subjective reports.

The ALJ also determined that Claimant's reported symptoms were inconsistent with the "generally normal or mild and stable findings noted by Ms. Markley on mental status examinations during the claimant's treatment sessions." [Dkt. 6-2 at 27.] Those findings include the following:

- Claimant was oriented as to place, person, and time and was "attentive."
- Claimant's speech rate, rhythm, and volume were normal.
- Claimant's gait was normal; he appeared well nourished and to be his stated age.
- Claimant did not have hallucinations, delusions, or suicidal or homicidal ideations.
- Claimant's thought process was "organized."
- Claimant's affect was "appropriate," but "constricted," and usually "anxious."
- Claimant's hygiene generally was "fair," but at times was "good," and once was recorded as "disheveled."
- Claimant's impulse control was "good" until May 31, 2019, and "fair" thereafter.
- Claimant's insight was "fair" from January 2019 through May 2019, and "limited" thereafter.

- Claimant's judgment was "fair" from January 2019 through May 2019, and "limited" thereafter, except in February 2020, when it was recorded as "improved."
- Claimant typically reported his mood as depressed and/or anxious, but it was reported as "good" in January 2019 and September 2019, "not as good" in March 2019, "kind of crappy" in May 2019, "improved" in February 2020, and "'bummed out' with his life circumstances" in June 2020.

*See* [Dkt. 6-7 at 48, 85, 90, 95, 100, 188, 194, 200, 233, 240, and 247].

It is not evident to the Court, and the ALJ again does not explain, why she believes a person with these findings on mental status examinations would not have the limitations set forth by Nurse Markley. The failure to provide this explanation, and support for it, as well as the other problems with the ALJ's reasoning discussed above, requires reversal, as the ALJ has failed to build the requisite logical bridge from the evidence to her conclusion that Nurse Markley's professional opinion is only "somewhat persuasive."

### B. Subjective Symptoms

Claimant also argues that "[t]he ALJ committed reversible error in rejecting [Claimant's] credibility concerning the severity of his mental impairments." [Dkt. 11 at 21.] The Court agrees.

Pursuant to Social Security Ruling 16-3p, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *3. Once established, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related

13

activities." *Id.*; 20 CFR § 404.1529(c)(1).³ The ALJ must then consider the claimant's alleged symptoms in light of his daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve the symptoms. 20 CFR § 404.1529(c)(3). The Court's review of this determination is generally deferential unless "after examining the ALJ's reasons for discrediting testimony, we conclude that the finding is patently wrong." *Larson v. Astrue*, 615 F.3d 744, at 751 (7th Cir. 2010). The ALJ's subjective symptom evaluation may be patently wrong where she fails to "'build an accurate and logical bridge between the evidence and the result.'" *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citing *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). Simply put, an ALJ "must competently explain an adverse-credibility finding with specific reasons supported by the record." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (citation and internal quotation marks omitted).

In this case, the ALJ concluded that,

> [a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

---

³ Social Security Ruling 16-3p, which rescinded Social Security Ruling 96-7p on March 28, 2016, requires that the ALJ assess a claimant's subjective symptoms, but not his *credibility*. SSR 16-3p, 2017 WL 5180304, at *2. The "change in wording is meant to clarify that [ALJs] aren't in the business of impeaching claimants' character; obviously [ALJs] will continue to assess the credibility of [subjective symptom] *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

14

[Dkt. 6-2 at 25.]  Those reasons are essentially the same reasons the ALJ gave for finding Nurse Markley's opinions to be only partially persuasive.  The ALJ found that based on Claimant's "admission regarding his ongoing high level of regular activities and interactions, a more restrictive functional assessment has not been warranted at any time relevant to this decision." *Id.*  As discussed above, the ALJ did not adequately explain how the activities she cites are inconsistent with Nurse Markley's conclusions; nor did the ALJ explain how those activities are not consistent with the symptoms alleged by Claimant.  The ALJ also points to what she terms the "generally normal and stable findings" as being inconsistent with Claimant's symptom allegations, but, as discussed above, the ALJ's characterization of the record with regard to Claimant's psychological impairments is not adequately supported.

       The ALJ failed to fulfill her obligation to "competently explain an adverse-credibility finding with specific reasons supported by the record."  *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (citation and internal quotation marks omitted).  This must be corrected on remand.

       **C.  Psychological Consultants' Opinions**

       Finally, Claimant argues that the ALJ's assessment of the two state psychological consultant opinions in the record is erroneous.  The consultants reviewed Claimant's records and opined about the limitations caused by his psychological impairments.  They found Claimant to be moderately limited in the following areas:  the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable manner and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. [Dkt. 6-3 at 8-9.] The consultants explained these limitations with the following narrative:

> **MRFC – Additional Explanation**
> Careful consideration has been given to the claimant's statements regarding alleged symptoms and their effects on functioning. Claimant's allegations of sx and effects on functioning appear consistent with information from ME. However, in terms of level of severity of functioning clt's allegations appear partially consistent with the information given adls appear generally wnl, concentration is moderately impacted but appears reasonable for tasks, and clt appears to be able to tolerate superficial, casual interactions with others.
>
> The totality of evidence in file suggests that the claimant is able to: understand, carry out and remember simple instructions; able to make judgments commensurate with functions of simple, repetitive tasks; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with changes in a routine work setting.
>
> It appears that claimant would be able to manage occasional contact with the public but sustained, intensive, interpersonal contact would be precluded. The claimant would appear to work best alone, in semi-isolation from others or as part of a small group. Totality of the MER suggests the claimant seems to be able to maintain at least a minimal level of relationship with others

*Id.* at 9.

The ALJ stated the following with regard to these opinions:

> I find these assessments largely persuasive as these individuals are deemed experts for the purposes of disability program rules and medical record review. In addition, the limitations assessed are largely consistent with the records documenting the claimant's symptom complaints as well as his positive response to treatment with generally mild or normal positive findings noted on mental status examinations. Those findings include full orientation, attentive presentation, fair hygiene, normal speech, depressed mood, appropriate but constricted affect, organized thought processes, normal thought content, good impulse control, and fair insight and judgment. His medication regimen. (Exhibits 4F. 7F, and 9F). However, these same findings and the additional testimony and reports from the claimant regarding his activities and functioning throughout the record, as discussed in detail above, support a finding that his impairments have resulted in no more than a mild restriction in his ability to understand, remember, and apply information.

16

[Dkt. 6-2 at 27.]   The ALJ then included the following non-exertional limitations in her RFC:

> [Claimant] can understand, remember, and carry out simple and detailed but uninvolved instructions in two hour increments sufficiently enough to complete an eight hour work day in an environment that does not require fast paced or production pace work.  In addition, he can tolerate occasional interaction with coworkers and supervisors but no more than incidental or superficial interaction with the public.  Finally, he must work in an environment where the work is stable and routine with no frequent workplace changes.

[Dkt. 6-2 at 22.]

Claimant argues that this assessment by the ALJ is erroneous because it fails to reflect "the extent of the social and concentration limitations reported by the state agency consultants" and accepted by the ALJ.  [Dkt. 11 at 18.]  Specifically, with regard to Claimant's ability to get along with others in the workplace, which has been identified as one of his main limitations, the state agency consultants found that Claimant "would appear to work best alone, in semi-isolation from others or as part of a small group," but "seems to be able to maintain at least a minimal level of relationship with others," could "tolerate superficial, casual interactions with others," and could "respond appropriately to brief supervision and interactions with coworkers and work situations."  [Dkt. 6-3 at 9.]  It is not clear whether the ALJ intended to incorporate this opinion in its entirety in her RFC, in which she found that Claimant could "tolerate occasional interaction with coworkers and supervisors but no more than incidental or superficial interaction with the public."  If so, the Court agrees with Claimant that she did not do so.  Limiting interactions with coworkers and supervisors to "occasional" speaks to the frequency of those interactions, and means that Claimant could spend up to one-third of each workday engaging in those interactions.  This limitation does not seem to encompass the state agency consultants' finding that Claimant's interactions with supervisors and coworkers should be "brief," "superficial," and "casual," and

that he would work best "alone, in semi-isolation," or "as part of a small group." On remand, the ALJ should take care to ensure that all of the state agency consultants' findings that she found to be persuasive are accounted for in her RFC (and her hypothetical questions to the vocational expert). If the ALJ chooses not to incorporate any of the state agency consultants' findings—whether in the "check box" or narrative portion of their report—in her RFC, the ALJ must explain the basis for that choice and identify the evidence that supports it.

## V. Conclusion

For the reasons stated above, the Commissioner's decision is **REVERSED AND REMANDED for further proceedings consistent with this Order**.

SO ORDERED.

Dated: 13 JUL 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.